IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNETTE D WOODS, | ) | CASE NO.  3:25-CV-00723-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | |

Plaintiff, Lynette D. Woods ("Plaintiff" or "Woods"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In November 2022, Woods filed an application for POD and DIB, alleging a disability onset date of January 1, 2017, and claiming she was disabled due to Grave's disease, hyperthyroidism, depression, and anxiety.  (Transcript ("Tr.") at 15, 52, 57.)  The application was denied initially and upon reconsideration, and Woods requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

On April 30, 2024, an ALJ held a hearing, during which Woods, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On May 28, 2024, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-24.)  The ALJ's decision became final on February 26, 2025, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On April 10, 2025, Woods filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 11-12.)  Woods asserts the following assignment of error:

(1) The ALJ's residual functional capacity finding is unsupported by substantial evidence. The ALJ failed to build an accurate and logical bridge from the evidence to the abilities reflected in the residual functional capacity finding. The ALJ failed to evaluate Plaintiff's subjective complaints pursuant to 20 C.F.R. §404.1529 and SSR 16-3p, and the ALJ failed to consider all relevant evidence relating to Plaintiff's functioning prior to the date last insured.

(Doc. No. 9.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Woods was born in August 1983 and was 35 years-old at the time of her date last insured (Tr. 23), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has at least a high school education.  (Tr. 23.)  She has no past relevant work.  (*Id.*)

### B.    Relevant Medical Evidence[2]

#### 1.    Treatment Records prior to the date last insured of December 31, 2018

On January 27, 2017, Woods saw Jeffrey Tuck, PA-C, for complaints of a right ear infection and mouth pain.  (*Id.* at 300.)  On examination, Tuck found normal cardiovascular sounds and rhythm.  (*Id.* at 301.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On April 12, 2017, laboratory results revealed a TSH level of 2.880 uIU/mL and a "low normal" free T4 level of 0.48 ng/dl.  (*Id.* at 376-77.)

On April 25, 2017, Woods saw Marilyn E. Roberts, APRN-CNP, to establish care.  (*Id.* at 296.) Woods reported a hyperthyroidism diagnosis with routine labs through her OB/GYN.  (*Id.*)  Woods told Roberts her OB/GYN had prescribed Methimazole, which "had immediate effects," and her OB/GYN had tapered Woods' dose from 20 mg to 5 mg.  (*Id.*)  Woods complained of anxiety, fatigue, numbness/tingling in her skull on the left, and palpitations.  (*Id.* at 296-97.)  Woods denied unintentional weight loss, changes in coordination, chest pain, pedal edema, shortness of breath, wheezing, heat/cold intolerance, muscle pain, and joint swelling.  (*Id.* at 297.)  On examination, Roberts found normal heart sounds and rhythm, normal gait, normal strength, no atrophy, and no abnormal movements.  (*Id.* at 298.)  Roberts diagnosed Woods with hyperthyroidism and depression with anxiety.  (*Id.*)  Roberts directed Woods to continue to follow up with Dr. Mishr for her hyperthyroidism, and should Woods stabilize, Roberts could take over care with six-month lab testing. (*Id.*)  Roberts started Woods on citalopram for her depression with anxiety.  (*Id.*)  Roberts also prescribed nystatin and Diflucan.  (*Id.*)

On May 23, 2017, laboratory results revealed a TSH level of 2.710 (reference range of 0.40-4.40 uIU/mL) and free T4 level of 1.05 (reference range of 0.80-1.80 ng/dl).  (*Id.* at 372.)

On May 25, 2017, Woods saw Suman Mishr, M.D., FACE, for follow up.  (*Id.* at 261.)  Her diagnosis consisted of thyrotoxicosis with toxic multinodular goiter without thyrotoxic crisis or storm.  (*Id.*)  Woods' medications consisted of Tapazole, Diflucan, and a multivitamin.  (*Id.*)

On November 28, 2017, laboratory results revealed a TSH level of 4.180 (reference range of 0.40-4.40 uIU/mL) and a free T4 level of 1.07 (reference range of 0.80-1.90 ng/dl).  (*Id.* at 368.)

On November 30, 2017, Woods saw Dr. Mishr for follow up.  (*Id.* at 259.)  Her diagnosis consisted of thyrotoxicosis with toxic multinodular goiter without thyrotoxic crisis or storm.  (*Id.*)  Dr. Mishr directed Woods to return to care in six months.  (*Id.* at 260.)

On May 26, 2018, laboratory results revealed a TSH level of 3.78 (reference range of 0.40-4.10 uIU/mL) and a free T4 level of 1.07 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 367.)

On May 31, 2018, Woods saw Dr. Mishr for follow up.  (*Id.* at 255.)  Her diagnosis consisted of thyrotoxicosis with toxic multinodular goiter without thyrotoxic crisis or storm.  (*Id.*)  Dr. Mishr directed Woods to return to care in six months.  (*Id.* at 256.)

On November 24, 2018, laboratory results revealed a TSH level of 4.00 (reference range of 0.40-4.10 uIU/mL) and a free T4 level of 1.12 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 366.)

On November 28, 2018, Woods saw Dr. Mishr for follow up of her Grave's disease and hypothyroidism.  (*Id.* at 257.)  Dr. Mishr noted Woods had active thyrotoxicosis with toxic multinodular goiter without thyrotoxic crisis or storm.  (*Id.*)

**2.      Treatment Records after the date last insured of December 31, 2018**

On May 22, 2019, laboratory results revealed a TSH level of 2.44 (reference range of 0.49-4.67 uIU/mL) and a free T4 level of 0.87 (reference range of 0.61-1.60 ng/dL).  (*Id.* at 365.)

On November 13, 2019, laboratory results revealed a TSH level of 1.89 and a free T4 level of 0.78. (*Id.* at 363.)

On November 18, 2019, Woods saw Dr. Mishr for follow up.  (*Id.* at 262.)  Woods' medication consisted of Diflucan and a multivitamin.  (*Id.*)  Dr. Mishr noted Woods had active thyrotoxicosis with toxic multinodular goiter without thyrotoxic crisis or storm.  (*Id.*)

On December 1, 2019, laboratory results revealed a TSH level of 2.510 (reference range of 0.40-4.10 uIu/mL) and a free T4 level of 1.10 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 352.)

On December 11, 2019, laboratory results revealed a TSH level of 1.09 (reference range of 0.49-4.67 uIU/mL) and a free T4 level of 0.82 (reference range of 0.61-1.60 ng/dL).  (*Id.* at 359.)

On January 8, 2020, laboratory results revealed a TSH level of 0.80 and a free T4 level of 0.79.  (*Id.* at 357-58.)

On January 27, 2020, Woods saw Dr. Mishr for follow up.  (*Id.* at 263.)  Dr. Mishr noted that Woods was "in a remission" and would be treated with isotope I-131 if her thyrotoxicosis returned.  (*Id.* at 264.)

On July 24, 2020, laboratory results revealed a low TSH level of less than 0.01 (reference range of 0.49-4.67 uIU/mL) and a high free T4 level of 1.87 (reference range of 0.61-1.60 ng/dL).  (*Id.* at 350.)

On July 27, 2020, Woods saw Dr. Mishr for follow up.  (*Id.* at 265.)  Dr. Mishr noted Woods was "in remission for the thyroid but the Methamezol has affected the hemoglobin.  It improved by stopping the Methamezol.  I discussed [w]ith the couple the need to hold off the methamezole."  (*Id.* at 266.)  Dr. Mishr prescribed Propranolol for a pulse greater than 80/minute for 30 days.  (*Id.* at 265.)

On September 10, 2020, laboratory results revealed a low TSH level of 0.01 (reference range of 0.49-4.67 uIU/mL) and a free T4 level of 1.25 (reference range of 0.61-1.60 ng/dL).  (*Id.* at 348.)

On October 29, 2020, laboratory results revealed a TSH level of 1.08 and a free T4 level of 0.80.  (*Id.* at 346.)

On November 4, 2020, Woods saw Dr. Mishr for follow up.  (*Id.* at 267.)  Dr. Mishr noted there had been "a recurrence" and Dr. Mishr ordered an isotope test to determine the uptake and scan the thyroid.  (*Id.* at 268.)  Dr. Mishr discussed treatment options with Woods "at great length."  (*Id.*)

On November 16, 2020, Woods saw CNP Roberts to establish care.  (*Id.* at 289.)  Woods denied physical limitations and told Roberts her weight was stable and that she exercised.  (*Id.*)  Woods also denied depression, anxiety, heart murmurs, heart palpitations, and abnormal bleeding.  (*Id.* at 290.)  On examination, Roberts found normal gait, normal strength, no atrophy, and no abnormal movements.  (*Id.* at

5

291.)  Roberts noted it was okay for her to manage Woods' hyperthyroidism while Dr. Mishr was out of the country.  (*Id.*)

On December 18, 2020, laboratory results revealed a high TSH level of 7.23 (reference range of 0.49-4.67 uIU/mL) and a free T4 level of 0.66 (reference range of 0.61-1.60 ng/dL).  (*Id.* at 345.)

On January 20, 2021, laboratory results revealed a TSH level of 3.66.  (*Id.* at 344.)

On May 18, 2021, laboratory results revealed a high TSH level of 5.57 and a free T4 level of 0.72.  (*Id.* at 343.)

On March 10, 2022, laboratory results revealed a TSH level of 4.64, a free T3 level of 3.46 (reference range of 2.50-3.90 pg/mL), and a free T4 level of 0.64.  (*Id.* at 342.)

On September 20, 2022, laboratory results revealed a high TSH level of 6.550, a free T3 level of 3.04, and a free T4 level of 0.95.  (*Id.* at 341.)

On October 31, 2022, laboratory results revealed a high TSH level of 5.170, a free T3 level of 3.1, and a free T4 level of 0.94.  (*Id.* at Tr. 340.)

On January 12, 2023, Woods saw CNP Roberts for follow up.  (*Id.* at 281.)  Woods denied fatigue but endorsed difficulty sleeping.  (*Id.* at 283.)  Woods further denied memory loss, headaches, and hair changes.  (*Id.*)  Woods endorsed depression, anxiety, and palpitations.  (*Id.*)  On examination, Roberts found normal gait, normal strength, no atrophy, and no abnormal movements.  (*Id.*)  Woods' diagnoses included hyperthyroidism and depression with anxiety.  (*Id.*)  Roberts started Woods on Sertraline.  (*Id.* at 284.)

On January 18, 2023, laboratory results revealed a high TSH level of 5.720 (reference range of 0.400-4.100 uIu/ml), a free T3 level of 3.3 (reference range of 2.2-4.2 pg/mL), and a free T4 level of 1.04 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 356.)

On February 8, 2023, Woods saw William Leahy, M.D., for follow up regarding her medication, hyperthyroidism, and Grave's disease.  (*Id.* at 334.)  Woods reported occasional sweating, a lot of fatigue,

and increased anxiety.  (*Id.*)  She used to have hair thinning.  (*Id.*)  Woods felt like she was over medicated.  (*Id.*)  Woods wanted to increase her Zoloft.  (*Id.*)  Dr Leahy noted normal examination findings except for hyperreflexia.  (*Id.*)  Dr. Leahy increased Zoloft, decreased Methimazole, and instructed Woods to undergo lab work and follow up in two months.  (*Id.*)

On March 31, 2023, laboratory results revealed a TSH level of 3.010 (reference range of 0.400-4.100 uIu/ml) and a free T4 level of 0.91 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 355.)

On April 5, 2023, Woods saw Dr. Leahy for follow up regarding her thyroid lab results.  (*Id.* at 333.)  Woods reported she was still "overactively" sweating, although it had improved since her last visit.  (*Id.*)  She also reported continued tiredness with no improvement.  (*Id.*)  She told Dr. Leahy her hair thinning had improved a bit, and she was starting to regain weight.  (*Id.*)  She wanted to discuss her periods.  (*Id.*)  Dr. Leahy noted normal examination findings.  (*Id.*)  Woods' diagnoses consisted of hyperthyroidism/Grave's disease and menorrhagia.  (*Id.*)  Dr. Leahy continued Methimazole and prescribed Tri-Sprintec.  (*Id.*)

On June 7, 2023, Woods saw Dr. Leahy for follow up and reported hot flashes and an "almost continual period."  (*Id.* at 332.)  Dr. Leahy prescribed Depo-Provera.  (*Id.*)

Laboratory results taken that same day revealed a TSH level of 2.570 (reference range of 0.400-4.100 uIu/mL) and a free T4 level of 1.20 (reference range of 0.80-1.90 ng/dL).  (*Id.* at 354.)

On September 6, 2023, laboratory results revealed a TSH level of 4.030 and a free T4 level of 0.94.  (*Id.* at 353.)

On September 6, 2023, Woods saw Dr. Leahy for follow up and reported having a lot of anxiety.  (*Id.* at 336.)  Woods' diagnoses consisted of Grave's disease and anxiety.  (*Id.*)  Dr. Leahy increased Woods' Zoloft dose.  (*Id.*)

On December 6, 2023, Woods saw Dr. Leahy for follow up and reported increased agitation and a lack of improvement on her current Zoloft dose.  (*Id.* at 335.)  Woods also endorsed anxiety, depression,

tiredness, palpitations, tremors, fatigue, increased weight, and continued sweating.  (*Id.*)  She told Dr. Leahy she was eating and sleeping okay.  (*Id.*)  Woods' diagnoses consisted of Grave's disease, anxiety, and depression.  (*Id.*)  Dr. Leahy continued Methimazole, refilled Propranolol, and increased Woods' Zoloft dose.  (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

On March 20, 2023, Matthew Wong, Ph.D., reviewed the file and opined that there was insufficient evidence in the file.  (*Id.* at 54.)  Dr. Wong explained: "Clmt has a DLI in the past. The file does not contain the necessary information to complete a medical assessment prior to DLI."  (*Id.*)

On August 21, 2023, on reconsideration, Mary Hill, Ph.D., affirmed Dr. Wong's findings as follows:

> The claimant reports anxiety and depression. Title 2 claim, DLI 12/31/2018. there is overall insufficient evidence to assess conditions or establish a psychological MDI from an AMS during the relevant time period.
>
> The prior administrative medical findings from the initial level's assessment of insufficient evidence is supported by and consistent with the current lack of evidence in file.

(*Id.* at 59.)

### 2.    Physical Impairments

On March 7, 2023, Gary Hinzman, M.D., reviewed the file and opined that there was insufficient evidence in the file.  (*Id.* at 53.)  Dr. Hinzman explained: "Clmt has a DLI in the past. The file does not contain the necessary information to be able to determine if she was disabled during that timeframe."  (*Id.*)

On July 31, 2023, on reconsideration, Johnny Craig, M.D., affirmed Dr. Hinzman's findings as follows:

> The claimant alleges Grave's Disease and hyperthyroidism. Title 2 only claim, DLI 12/31/2018. There is limited information for the relevant time period and such information is not sufficient to fully evaluate all her conditions and functioning.

8

> The prior administrative medical findings from the initial level's assessment of insufficient evidence is supported by and consistent with the current lack of evidence in file.
>
> THERE IS NO EVIDENCE THAT THE HYPERTHYROIDISM IS STILL PRESENT WITH RX AND THERE WOULD BE NO FUNCTIONAL PROBLEMS FROM THE SAME. PHYSICAL NS.

(*Id.* at 58-59.)

## D.    Hearing Testimony

During the April 30, 2024 hearing, Woods testified to the following:

- She lives in a house with her husband and son. (*Id.* at 34.) Her son is ten years old. (*Id.* at 35.) He plays basketball and baseball. (*Id.*) She attends his events. (*Id.*)

- Before the date last insured ("DLI"), she struggled to walk up and down stairs because of muscle spasms and muscle weakness. (*Id.* at 34.) Her muscles would give out and she would fall down the stairs. (*Id.*) She had pain, a fast, irregular heartbeat, palpitations, muscle pain, aches and pains all over her body, tremors in her hands, and blurry vision. (*Id.* at 39.) She bled for a month without stopping. (*Id.*) She couldn't go anywhere because she would bleed through her clothes. (*Id.*) Her doctors couldn't stop the bleeding.[3] (*Id.*) She was nervous and irritable. (*Id.* at 39-40.)

- During the relevant time period, she could read, write, and sign her name, as well as count change and operate a bank account. (*Id.* at 36.) She could drive herself. (*Id.*) She could take care of her personal hygiene. (*Id.*) Some days she could barely get out of bed. (*Id.* at 40.) She passed out sometimes. (*Id.*) She could barely lift anything. (*Id.*) When she was really sick, she stayed at home. (*Id.*) On a typical day, her husband would help her out of bed; sometimes, she couldn't get out of bed because she hurt too much. (*Id.* at 41.) She tried to clean. (*Id.*) She would sit down and then get back up and clean some more. (*Id.*) She watched TV and talked to friends and family on the phone. (*Id.*) She could cook, mop, sweep, and do the dishes and laundry, she just had to take her time doing it. (*Id.*) She went grocery shopping with her husband. (*Id.*) She talked to family on Facebook. (*Id.*) She went to church a few times. (*Id.* at 42.) She took care of her son. (*Id.*) She also took care of their cat. (*Id.*)

- She could not work before the DLI because she was "really, really sick" and did not get better. (*Id.* at 37-38.) Her symptoms included an irregular heartbeat, nervousness, irritability, anxiety, difficulty sleeping, fatigue, muscle spasms, tremors, muscle weakness, blurry vision, and menstrual problems. (*Id.* at 38.) She went to urgent care

---

[3] In response to a question from her attorney, Woods affirmed that they were unable to get the records from her gynecologist because the gynecologist no longer practiced. (*Id.* at 43.)

thinking she was having a heart attack.  (*Id.*)  Dr. Mishr diagnosed her with Grave's disease and hyperthyroidism.  (*Id.*)  She also had anxiety and depression.  (*Id.*)

- Before the DLI, she could not work a job sitting and sorting nuts and bolts all day because of her shaky hands, rapid heartbeat, and muscle weakness.  (*Id.* at 43.)

- Before the DLI, she took medication for her Grave's disease, palpitations, and high pulse.  (*Id.* at 39.)  She also took Propranolol for her anxiety and depression.  (*Id.*)  Her medications caused dry mouth.  (*Id.* at 40.)  She is on the same medications now as she was before the DLI, although she is taking a higher dose of Zoloft now.  (*Id.* at 44.)

The ALJ found Woods had no past relevant work.  (*Id.* at 37.)  The ALJ then posed the following hypothetical question:

> For Hypothetical #1, please assume a hypothetical individual of Claimant's age, education, relevant vocational background.  She can occasionally climb ramps and stairs, ladders, ropes, and scaffolds.  She can frequently stoop, defined as bending at the waist, crouch, defined as bending at the knees, kneel and crawl.  She's to avoid unprotected heights and dangerous machinery.  Can the hypothetical individual – well, there is no past work.  Are there – is there any work that can be performed with these limitations?  And if so, Ms. Srinivasan, can you list the numbers and the jobs?

(*Id.* at 46.)

The VE testified that the hypothetical individual would be able to perform other representative jobs in the economy, such as machine packager, motor vehicle assembler, and bagger (medium exertion), store cashier, housekeeping cleaner, and storage attendant (light exertion), and document preparer, ticket counter, and touchup screener (sedentary exertion).  (*Id.* at 47-48.)

The ALJ modified Hypothetical #1 to limit the individual to "simple, routine tasks, but not at a production rate pace, for example, no assembly line work."  (*Id.* at 49.)  The VE testified the motor vehicle assembler job could not be done.  (*Id.* at 50.)  The VE further testified the hypothetical individual could perform the job of dish washer.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

10

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Woods was insured on the alleged disability onset date, January 1, 2017, and remained insured through December 31, 2018, the DLI. (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Woods must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2017, through her date last insured of December 31, 2018 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: Graves' disease, hyperthyroidism, thyrotoxicosis with toxic multinodular goiter, depression, and anxiety (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can occasional [sic] climb ramps, stairs, ladders, ropes, or scaffolds, frequently stoop (defined as bending at the waist), crouch (defined as bending at the knees), kneel, and crawl, and she should avoid unprotected heights and dangerous machinery. She is limited to simple, routine tasks, but not at a production rate pace. For example, no assembly line work.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born on August **, 1983, and was 35 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2017, the alleged onset date, through December 31, 2018, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-24.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence

13

could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

**VI. ANALYSIS**

Woods raises two sub-arguments in her sole assignment of error: (1) the ALJ erred by failing to evaluate records post-dating Woods' DLI of December 31, 2018 and (2) the ALJ erred by failing to include

14

mental limitations into the RFC.[4]  (Doc. No. 9 at 12, 18.)  The Court addresses each of these sub-arguments in turn.

**A.      Records Post-Dating Woods' DLI**

Woods argues that the records post-dating her DLI "shows the continuation of treatment" for the impairments the ALJ found severe at Step Two and that existed as of the DLI.  (Doc. No. 9 at 13.)  Woods asserts that "[g]iven the lack of detail in the existing records of Dr. Mishr and given that the gynecologist's records from the relevant time frame are unavailable, *see* Tr. 43, the records dated after December 31, 2018 help illuminate Plaintiff's functioning prior to December 31, 2018, and the ALJ erred when failing to evaluate the new records."  (*Id.*)  Woods maintains that this is harmful error, as "the ALJ rejected Plaintiff's allegations for lack of support, and the updated records support Plaintiff's allegations of greater limitations."  (*Id.*)  Woods argues that except for a "brief period in 2020," she "had active thyrotoxicosis from 2017 through December 2023."  (*Id.*  at 14.)  Woods asserts that her testimony regarding her symptoms before her DLI matches the symptoms described by the Cleveland Clinic for thyrotoxicosis.  (*Id.* at 15.)  Woods argues that, beyond the bloodwork regarding her thyroid function, "it is unclear what other objective findings would be relevant to thyrotoxicosis," and therefore the ALJ's citation to findings such as a normal gait, normal strength, and no atrophy or abnormal movements "do not relate to thyrotoxicosis."  (*Id.* at 15-16.)  Woods maintains that the medical records post-dating the DLI "describe [her] symptomology resulting from [her] thyrotoxicosis."  (*Id.* at 16.)

---

[4] In two sentences, Woods asserts: "The ALJ failed to provide any explanation for the postural and hazard related limitations other than stating Plaintiff's severe impairments and restating the RFC finding. Tr. 23. The decision is devoid of an accurate and logical bridge from the evidence to the postural and hazard related limitations, and the physical portion of the RFC finding is unsupported by substantial evidence."  (Doc. No. 9 at 9.)   The Court finds this argument waived for lack of development.   "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.,* 447 F.3d 861, 868 (6th Cir. 2006).

The Commissioner responds that Woods fails "to show how the evidence closest in time" to her DLI of December 31, 2018 "supports her assertion of disabling limitations during the period at issue." (Doc. No. 11 at 18.) The Commissioner asserts that Woods' 2019 lab results were normal, and Dr. Mishr did not prescribe any medication. (*Id.*) (citing Tr. 262, 363, and 365). In January 2020, Dr. Mishr noted that Woods' thyrotoxicosis was in remission, and it remained in remission until November 2020, almost two years after Woods' DLI. (*Id.* at 18-19.) The Commissioner argues:

> Additionally, despite a recurrence of her thyrotoxicosis in late 2020, an examination by Ms. Roberts a few weeks later revealed that Plaintiff was alert, oriented, and well-groomed with no thyromegaly or neck tenderness, even and easy respirations, a normal gait, normal strength, and no atrophy or abnormal movements (Tr. 291). At that time, Plaintiff reported only mild depression, denied pain or physical limitations, reported a stable weight, and endorsed exercising (Tr. 289, 291). She indicated that she had friends, was family-oriented, and took time for leisure activities (Tr. 289). Furthermore, there is no evidence of menorrhagia or increased thyroid-related complaints until 2023 (Tr. 281-84, 319-20, 332, 335-36). Plaintiff has not shown that the post-date last insured evidence either supported her allegations or was relevant to the period at issue by establishing that her impairments "existed continuously and in the same degree as before the expiration of [her] date last insured." *Zingale*, 2024 WL 3379288 at *11 (citations omitted). Thus, the ALJ did not err in her determination to not consider this evidence in her decision.

(*Id.* at 19.)

In the RFC analysis, the ALJ found as follows:

> The record contains evidence dated after the date last insured. This evidence is outside of the relevant period and does not provide pertinent evidence with regard to the claimant's ability to work between her alleged onset date of January 1, 2017, through her date last insured of December 31, 2018 (Exs. 2F, 3F, 4F, 5F, 6F, 7F, & 9F).

(*Id.* at 21.)

"Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988)). "[S]ince this case is limited to DIB, evidence that

16

post-dates the date last insured is not relevant, except to the extent that it bears on Plaintiff's functioning from the alleged onset date through the date last insured." *Mayer v. Comm'r of Soc. Sec.*, Case No. 3:18CV2235, 2020 WL 415522, at *8 (N.D. Ohio Jan. 27, 2020) (collecting cases).

The Court agrees with the Commissioner that Woods has failed to show how the medical evidence closest in time to her December 31, 2018 DLI supports her allegations of disabling limitations during the relevant period.  Lab testing in 2019 and early 2020 showed normal TSH and free T4 levels.  (Tr. 352, 357-59, 363, 365.)  On January 27, 2020, Dr. Mishr determined Woods' thyrotoxicosis was in remission.  (*Id.* at 263-64.)  On July 27, 2020, Dr. Mishr noted Woods was "in remission for the thyroid" but her medication had affected her hemoglobin, and it had improved once she stopped the medication.  (*Id.* at 265-66.)  While Dr. Mishr determined there had been a recurrence of thyrotoxicosis in November 4, 2020, at an appointment with CNP Roberts less than two weeks later, Woods denied physical limitations and told Roberts her weight was stable and that she exercised.  (*Id.* at 289.)  Woods also denied depression, anxiety, heart murmurs, heart palpitations, and abnormal bleeding.  (*Id.* at 290.)  On examination, Roberts found normal gait, normal strength, no atrophy, and no abnormal movements.  (*Id.* at 291.)

Records from December 2020 through October 2022 consisted of fluctuating thyroid levels but no indication of limitations of functioning or any descriptions of symptoms.  It is not until January 12, 2023—over four years after Woods' DLI—that the records post-dating the DLI begin to detail Woods' symptomology.

Here, even after the expiration of Woods' insured status, the medical evidence closest in time to her DLI suggested she was not disabled.  *Strong*, 88 F. App'x at 845.  "But more importantly, as to the relevant time period, there is substantial evidence for the ALJ's conclusion" that Woods was capable of a limited range of work at all exertional levels.  *Id.*  Woods "simply failed to present any contemporaneous medical evidence of disability from the relevant time period."  *Id.*

17

The ALJ therefore did not commit reversible error in failing to consider evidence post-dating Woods' DLI and in finding that it did not "provide pertinent evidence with regard to [Woods'] ability to work" during the relevant time period.

## B.      Mental RFC Findings

In her second assignment of error, Woods argues that the ALJ's RFC finding limiting Woods to "simple, routine tasks, but not at a production rate pace," for example, no assembly line work, was "inconsistent with the ALJ's step 3 finding, and the ALJ failed to explain why the additional limitations were excluded from the RFC finding." (Doc. No. 9 at 18.) Woods asserts that the ALJ failed to build an accurate and logical bridge from the evidence to the paragraph B findings at step three and the mental RFC findings. (*Id.*) Woods recognizes that "the ALJ is not bound by his or her step three findings" when determining the RFC. (*Id.* at 19.) However, Woods maintains that "the ALJ failed to explain how the evidence supports no mental limitations other than simple and routine work that is not a production rate pace." (*Id.*) Woods argues that the ALJ "merely restated the RFC finding" without building an accurate and logical bridge from the evidence to the RFC finding. (*Id.*) Woods asserts that the ALJ's "lack of analysis prevents the Court from determining how the RFC" reflects the limitations the ALJ found at step three. (*Id.* at 20.) Woods claims that the ALJ "provided virtually no evaluation of the evidence" to explain the mental RFC findings, and the ALJ "failed to provide any reason for discounting" Woods' statements regarding her depression and anxiety." (*Id.* at 21.) Woods maintains the ALJ failed to comply SSR 16-3p, as the ALJ "failed to address the factors" set forth in SSR 16-3p. (*Id.*) Woods argues that the ALJ's "mere reference" to her daily activities fails to explain how Woods' symptoms are inconsistent, and the ALJ erred in failing to explain how Woods' daily activities "show greater abilities." (*Id.* at 22.)

The Commissioner responds that substantial evidence supports the ALJ's RFC findings, as well as the ALJ's subjective symptom analysis. (Doc. No. 11 at 11.) The Commissioner argues that "[b]y

18

discussing Plaintiff's lack of objective findings, her reports to treating providers, her treatment regimen and efficacy, Plaintiff's daily activities, and the prior administrative medical findings of the State agency medical and psychological consultants in the context of Plaintiff's allegations, the ALJ built an 'accurate and logical bridge' between the evidence and her conclusions." (*Id.* at 13.)  The Commissioner asserts that the ALJ "then reasonably accounted" for Woods' impairments by finding "postural, environmental, and mental limitations." (*Id.*) The Commissioner argues that the ALJ accounted for any limitations in Woods' ability to understand, remember, and apply information by limiting her to "simple, routine tasks." (*Id.* at 15) (citing *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 866 (6th Cir. 2011)).  The Commissioner maintains that the ALJ considered Woods' mental impairments in the RFC analysis and "was not required to include any functional limitations related to interacting with others or adapting and managing oneself in the RFC, as she reasonably found that Plaintiff's mental functioning in these areas did not significantly limit her daily functioning during the period at issue." (*Id.* at 17-18) (citations omitted).

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before

19

him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to

20

remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c)(1). *See also* SSR 16-3p,[5] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[6] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's

---

[5] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the April 30, 2024 hearing.

[6] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

21

symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[7] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Woods' testimony and other statements regarding her mental symptoms and limitations. (Tr. 18-21.) The ALJ determined Woods' medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 21.) However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)

At step three, the ALJ found as follows regarding Woods' mental impairments:

> In understanding, remembering or applying information, the claimant had a moderate limitation. In interacting with others, the claimant had a mild limitation. With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation. As for adapting or managing oneself, the claimant had experienced a mild limitation.

---

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

22

In reports to the agency, the claimant alleged that she is unable to work due to Grave's Disease, hyperthyroidism, anxiety, depression, muscle spasms, body aches, and hot flashes (Exs. 1E, 3E, 5E, & 7E).

During the hearing, the claimant testified that prior to her date last insure [sic], she had muscle spasms and weakness, her legs would give out and cause her to fall down the stairs, she completed some college, she could read and write, she could operate a bank account, she could drive, and she could care for her selfcare and hygiene. She detailed her past work, but alleged that prior to her date last insured, she was really sick, and she did not get better. She alleged that she had irregular heartbeat, tremors, nervousness, irritability, trouble sleeping, fatigue, spasms, blurred vision, and menstrual cycles where she bled through everything. She alleged that she thought she was having a heart attack, so she went to urgent care, then she went to the emergency room. She alleged that she was diagnosed with Grave's Disease, hyperthyroidism, anxiety, and depression prior to her date last insured. As for treatment, she was on medication for Grave's disease, heart palpitations, anxiety, and depression. She alleged that she had pain in her legs and in her muscles all over her body, she would bleed that would not stop, and her heart would beat fast with palpitations. She further alleged that she had dry mouth as a medication side effect.

Prior to her date last insured, she alleged that she could hardly get out of bed, she would pass out, she could hardly lift anything, and she would stay home. As for her typical day prior to the date last insured, she would watch television, talk with people on the phone, chores, clean, grocery shop with her husband, care for a pet, and use her phone for social media. When asked if she could have done a job seated sorting nuts and bolts all day prior to her date last insured, the claimant stated that she could not shaky hands, rapid heartbeat, muscles giving out, and trouble lifting. When questioned by her representative, the claimant acknowledged that she had no hospitalizations or counseling treatment during the relevant period. Finally, she noted that at one point it felt that she would be better off if she were not alive due to her depression.

As for the relevant evidence from January 1, 2017, through her date last insured of December 31, 2018, the claimant received care at the Lima Memorial Health System on multiple occasions.

On January 27, 2017, for an acute ear infection and mouth pain. She was assessed with otitis externa, but the rest of her exam was normal. On April 25, 2017, she was assessed with hyperthyroidism and depression and anxiety. The claimant alleged fatigued, palpitations, and depression symptoms including feeling down trouble sleeping, little energy, and psychomotor agitation, but she denied chest pain, edema, coordination problems shortness of breath, wheezing, muscle pain, joint swelling, and urinary concerns. On exam, she was alert and oriented with intact cranial

23

nerves without tremors. Her ear, nose, mouth, neck, pulmonary, cardiovascular, and musculoskeletal exams were normal. She had a normal gait, normal strength, no atrophy, and abnormal movements. She was prescribed citalopram, Diflucan, and Nystatin. On February 7, 2018, she had an appointment for acute influenza, fever, and pharyngitis. Other than her acute sickness, the rest of her exam was normal. She had a normal mood and affect, she was alert and oriented, her gait was normal, and her strength was normal (Ex. 4F).

As noted above, the claimant was prescribed citalopram for her anxiety and depression in April 2017, which was apparently effective because by February 2018, she had a normal mood and affect, and she was alert and oriented Therefore, to give the claimant the full benefit of doubt based on her allegations, the undersigned finds that she has no more than moderate limitations in understanding, remembering, and applying information and concentrating, persisting, and maintaining pace, and nor more than mild limitations in interacting with others and adapting and managing oneself.

(Tr. 18-19.)

In the RFC analysis, the ALJ further found as follows regarding Woods' mental impairments:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because they are not supported in anyway by the treatment records. For example, the claimant evidence with regard to the claimant's thyroid condition contains zero clinical findings or any allegations that support the claimant's extreme limitations she alleged during the hearing. In fact, the only evidence is blood work that confirmed the claimant's thyroid dysfunction (Exs. 2F, 9F & 10F). Likewise, the clinical findings from the Lima Memorial Health System do not support any of the claimant's allegations regarding weakness, falling, severe pain, trouble lifting, or tremors. For example, on exam on April 25, 2017, she was alert and oriented with intact cranial nerves without tremors. Her ear, nose, mouth, neck, pulmonary, cardiovascular, and musculoskeletal exams were normal. She had a normal gait, normal strength, no atrophy, and abnormal movements. Likewise, on exam on February 7, 2018, she had a normal mood and affect, she was alert and oriented, her gait was normal, and her strength was normal (Ex. 4F).

* * *

24

As for the relevant evidence from January 1, 2017, through her date last insured of December 31, 2018, the claimant received care at the Lima Memorial Health System on multiple occasions. On January 27, 2017, for an acute ear infection and mouth pain. She was assessed with otitis externa, but the rest of her exam was normal. On April 25, 2017, she was assessed with hyperthyroidism and depression and anxiety. The claimant alleged fatigued, palpitations, and depression symptoms including feeling down trouble sleeping, little energy, and psychomotor agitation, but she denied chest pain, edema, coordination problems shortness of breath, wheezing, muscle pain, joint swelling, and urinary concerns. On exam, she was alert and oriented with intact cranial nerves without tremors. Her ear, nose, mouth, neck, pulmonary, cardiovascular, and musculoskeletal exams were normal. She had a normal gait, normal strength, no atrophy, and abnormal movements. She was prescribed citalopram, Diflucan, and Nystatin. On February 7, 2018, she had an appointment for acute influenza, fever, and pharyngitis. Other than her acute sickness, the rest of her exam was normal. She had a normal mood and affect, she was alert and oriented, her gait was normal, and her strength was normal (Ex. 4F).

\* \* \*

The State Agency Psychological Consultant determined that there was insufficient evidence to evaluate the claimant's allegations prior to her date last insured (Ex. 1A). Upon reconsideration, State Agency Psychological Consultant determined that there was insufficient evidence to evaluate the claimant's allegations prior to her date last insured (Ex. 3A). These opinions are not persuasive because the evidence detailed above, confirms that the claimant had anxiety and depression treated with citalopram prior to her date last insured (Ex. 4F).

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the test results, the clinical findings, the progress notes, and the claimant's activities of daily living. The undesigned has fully accommodated for the claimant's Graves' disease, hyperthyroidism, and thyrotoxicosis with toxic multinodular goiter, by finding that she can only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, frequently stoop (defined as bending at the waist), crouch (defined as bending at the knees), kneel, and crawl, and she should avoid unprotected heights and dangerous machinery. Likewise, her depression and anxiety were fully accommodated by limited her to simple, routine tasks, but not at a production rate pace. For example, no assembly line work.

(*Id.* at 21-23.)

The Court finds substantial evidence supports the ALJ's assessment of Woods' subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Woods' allegations of disabling conditions. (*Id.* at 18-23.) The ALJ credited some of Woods' subjective symptoms but did not accept them to the extent alleged by Woods because of findings on examinations, her own statements, and activities of daily living, factors to be considered under the regulations. (*Id.*) While it is true that the ALJ did not acknowledge that Woods testified she "took her time" doing chores around the house, the fact remains that the ALJ considered other evidence besides Woods' activities of daily living in discounting the extent of Woods' subjective symptoms. (*Id.*) Furthermore, as this Court has recognized, a "[c]laimant's mild limitations do not automatically mandate specific limitations in the RFC. *See, e.g.*, *Little v. Comm'r of Soc. Sec.*, No. 2:14-cv-532, 2015 WL 5000253, at *13–14 (S.D. Ohio Aug. 24, 2015) (finding no error where ALJ did not include RFC limitations to address findings of mild mental limitations); *Caudill v. Comm'r of Soc. Sec.*, No. 2:16-CV-818, 2017 WL 3587217, at *5 (S.D. Ohio Aug. 21, 2017) (finding that mild mental impairment does not require inclusion of mental limitations in RFC); *Walker v. Astrue*, No. 3:11-cv-142, 2012 WL 3187862, at *4–5 (S.D. Ohio Aug. 3, 2012) (finding that substantial evidence supported the ALJ's determination that the claimant's mental impairments were mild enough not to warrant specific RFC limitations)." *Phillips v. Comm'r of Soc. Sec. Admin.*, Case No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *6 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted sub nom. Phillips v. Comm'r of Soc. Sec.*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023)).

The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: April 1, 2026

                                                    *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                             United States Magistrate Judge